**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RICHARD RYAN,**

　　　　　　　　　**Plaintiff,**

　　　　**v.**

**EARL BELL et al.,**

　　　　　　　　**Defendants.**
_____

**9:20-cv-602**
**(GLS/DJS)**

| APPEARANCES: | OF COUNSEL: |
|---|---|

**FOR THE PLAINTIFF:**
Sussman, Watkins Law Firm
1 Railroad Avenue
P.O. Box 1005
Goshen, NY 10924

MICHAEL H. SUSSMAN, ESQ.

**FOR THE DEFENDANTS:**
Hon. Letitia James
New York State Attorney General
The Capitol
Albany, NY 12224

BRENDA T. BADDAM
CHRISTOPHER J. HUMMEL
Assistant Attorneys General

**Gary L. Sharpe**
**Senior District Judge**


## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Richard Ryan commenced this action against defendants

Earl Bell, Theodore C. Zerniak,[1] Gregory T. King, Daniel J. Bombardier, and Jonathan Proulx, alleging violation of his Eighth Amendment rights, brought pursuant to 42 U.S.C. § 1983.[2]  (Compl., Dkt. No. 1.)  Now pending is defendants' motion for summary judgment.  (Dkt. No. 37.)  For the reasons that follow, defendants' motion is granted in part and denied in part as follows.

## II. Background

### A.   Facts[3]

In June 2019, Ryan was an inmate in the custody of the New York State Department of Corrections and Community Supervision (DOCCS) and was housed at Clinton Correctional Facility.  (Defs.' Statement of Material Facts (SMF) ¶¶ 1, 7, Dkt. No. 37, Attach. 2.)  On June 11, 2019, Ryan was injured in a brawl on the North Yard at Clinton, involving 45-60

---

[1]  Ryan concedes that Bell and Zerniak should be dismissed from this action, with prejudice, due to lack of personal involvement "in any of the actions/inactions which form the basis for this lawsuit."  (Dkt. No. 40 at 1.)  The court agrees and, therefore, the motion is granted as to Bell and Zerniak.

[2]  The last names of Bombardier and Proulx are listed as "Bombadier" and "Proloux" in the complaint, however, the summary judgment record reveals the correct spelling is "Bombardier" and "Proulx," respectively.  (Dkt. No. 39, Attachs. 4, 5; Dkt. No. 37, Attachs. 5, 7.)  The Clerk is directed to amend the docket to reflect this change to the spelling of these defendants' names.

[3]  Unless otherwise noted, the facts are not in dispute.

incarcerated individuals, and, as a result of injuries he sustained, was taken to Champlain Valley Physicians Hospital (CVPH) for further medical attention.  (*Id.* ¶¶ 25, 30, 48, 49.)

At some time prior to June 7, 2019, Particia Erbe, Ryan's fiancée, called Proulx, Ryan's Offender Rehabilitation Coordinator (ORC), to report that she had a general concern for Ryan's safety.  (*Id.* ¶¶ 8-11.)  Erbe called a second time and, according to defendants, her call was forwarded to Tara Brayton, Proulx's supervisor, who informed Erbe that further and specific information was necessary before action could be taken on her generalized safety concern.[4]  (*Id.* ¶ 13.)  On June 7, 2019, Proulx and Ryan met to discuss Erbe's safety concern.  (*Id.* ¶ 14.)  Proulx testified that he initiated the meeting, while Ryan testified that he arranged to see Proulx because he was concerned for his own safety.  (Pl.'s Response to Defs.' SMF ¶ 14, Dkt. No. 39; Dkt. No. 39, Attach. 4 at 18:4-19:17.)  Proulx and Ryan also give conflicting versions of what occurred during the June 7 meeting: (1) Proulx testified that he asked Ryan if he wanted to speak with

---

[4]  Ryan disputes paragraph 13 of defendants' statement of material facts solely on the basis that "there is no documentation of any such response in any official record and a reasonable jury could conclude that this account is false."  (Dkt. No. 39 ¶ 13.)  The facts contained in paragraph 13 are recited in, and supported by, Proulx's declaration.  (Dkt. No. 37, Attach. 7 ¶ 14.)  Ryan provides no citation to evidence that contradicts Proulx's testimony, therefore, paragraph 13 of defendants' statement of material facts is deemed admitted.

security regarding his safety concerns, while Ryan's version of events is that Proulx never asked him about speaking with security, (Pl.'s Response to Defs.' SMF ¶ 15); (2) Proulx states that Ryan denied being in danger, but Ryan testified that he sought Proulx out for this exact reason, (*id.* ¶ 16); (3) Ryan testified that he explained the reasons he feared for his safety during the meeting, while Proulx's recollection is that Ryan provided no information to corroborate the concerns voiced by Erbe, (*id.* ¶ 19); and (4) Ryan testified repeatedly that he asked to be put in protective custody, but Proulx's version of events is that "[a]t no time prior to June 11, 2019 did [Ryan] request protective custody," (*id.* ¶ 21). There is no evidence in the record that suggests Proulx took action directly as a result of the meeting on June 7, 2019 before the incident on June 11, 2019 occurred.

On June 11, 2019, while there were nearly 350 incarcerated individuals in the North Yard, a fight began, which then "erupt[ed] into a brawl involving 45-60 incarcerated individuals." (Defs.' SMF ¶ 25.) Bombardier and King were both employed by DOCCS as Sergeants at Clinton at that time. (*Id.* ¶ 26.) Bombardier was supervising the North Yard when the initial four-man fight began. (*Id.* ¶ 28.) Using his facility radio, Bombardier activated a "level 2" alert, an alert that requests all

available staff to respond and provide assistance.[5]  (*Id.* ¶ 29.)  At that time,

the Clinton staff was generally outnumbered by the total number of

incarcerated individuals in the North Yard by a ratio of 20:1.[6]  (*Id.* ¶ 32.)

The brawl/riot began when "someone was cut on the way into the

facility" and "escalated to which point the whole yard got involved."  (*Id.*

¶ 45.)  The inmates involved "ignored several direct orders from corrections

officers to cease fighting and lie on the ground."  (*Id.* ¶ 31.)  "[D]ue to

safety concerns, given that the officers were outnumbered," Bombardier

then "ordered the staff in the yard to go to 'Post 1,' wait

for a response team, and let the tower officers attempt to quell the

disturbance with chemical agents."  (*Id.* ¶¶ 33, 35.)  Security staff that were

located in elevated towers overlooking the North Yard then discharged

canisters of chemicals agents (i.e., tear gas) into the yard to quell the

_____

[5]  Ryan denies that "Bombardier ever so testified" as to the assertions in paragraph 29 of defendants' statement of material facts.  (Pl.'s Response to Defs.' SMF ¶ 29.)  Ryan's attempted denial is a non sequitur; there is no requirement that facts must be stated in a deposition to be admitted for the purposes of summary judgment and defendants properly cite to Bombardier's and King's declarations, which are competent and admissible evidence, as support for the facts contained in paragraph 29.  (Defs.' SMF ¶ 29.)  Therefore, paragraph 29 of defendants' statement of material facts is deemed admitted.

[6]  Ryan's denial of paragraph 32 of defendants' statement of material facts is, likewise, a non sequitur.  (Pl.'s Response to Defs.' SMF ¶ 32.)  The staff may have been outnumbered approximately "4 to 1 or 5 to 1" by the 50-60 inmates engaged in the brawl, but there were, by Ryan's own admission, nearly 350 inmates in the North Yard in total—approximately twenty times the number of officers there at the beginning of the brawl.  (*Id.*; Defs.' SMF ¶ 25.)  Paragraph 32 of defendants' statement of material facts is, therefore, deemed admitted.

fighting.  (*Id.* ¶ 34.)  According to Bombardier and King, it is DOCCS policy "to use tear gas to quell disturbances, like the relevant incident[,] before officers on the ground can respond appropriately and safely" and that the officers acted in accordance with said policy.[7]  (*Id.* ¶¶ 36-37.)

The tear gas was initially effective at bringing about a cease to the fighting, but wind caused the chemical agents to disburse quickly and the fighting resumed.  (*Id.* ¶¶ 38-39.)  Security staff then fired more tear-gas canisters into the North Yard, eventually resulting in the inmates' compliance with officers' directions to cease fighting.  (*Id.* ¶ 40.)  Approximately twenty-two canisters of tear gas were fired by security staff.  (*Id.* ¶ 41.)

At some point during the riot, Ryan became involved in the melee to assist an "associate" who was being attacked.  (*Id.* ¶ 46.)  Ryan "fought back" and threw punches at other inmates, but was eventually knocked

---

[7]  Ryan's denials to paragraphs 36 and 37 of defendants' statement of material facts are that defendants "have produced no such DOCCS policy."  (Pl.'s Response to Defs.' SMF ¶¶ 36-37.)  However, the declarations of King and Bombardier, which state such policy exists, are competent and admissible evidence that can be considered at this juncture.  Defendants do not claim such a policy is necessarily in writing.  Moreover, Ryan can point to no policy or directive from DOCCS, or elsewhere, that requires or directs officers to act differently than described by King and Bombardier.  Therefore, the evidence offered by defendants being admissible, and Ryan failing to meet his burden to refute such evidence, paragraphs 36 and 37 of defendants' statement of material facts are deemed admitted.

unconscious.  (*Id.* ¶¶ 48-49.)  Ryan's injuries were sufficiently serious to require that he be transported to CVPH to receive medical attention after the riot was subdued.  (*Id.* ¶ 49.)  Upon arrival at CVPH, doctors noted facial trauma and multiple lacerations to Ryan's chest, neck, and face, (Dkt. No. 39, Attach. 15 at 2[8]), and he required over ninety stitches, (Dkt. No. 39, Attach. 2 at 3[9]).

## B.   Procedural History

Ryan commenced this action, alleging that defendants were deliberately indifferent to his safety and security needs and, thereby, violated his Eighth Amendment rights.  (Compl.)  Defendants answered the complaint.  (Dkt. No. 16.)  Now pending is defendants' motion for summary judgment.  (Dkt. No. 37.)

## III.  Standard of Review

The standard of review under Fed. R. Civ. P. 56 is well settled and will not be repeated here.  For a full discussion of the governing standard, the court refers the parties to its prior decision in *Wagner v. Swarts*, 827 F.

---

[8]  The citation refers to the pagination generated by CM/ECF, the court's electronic filing system.

[9]  The citation refers to the pagination generated by CM/ECF, the court's electronic filing system.

Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV. <u>Discussion</u>

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)). For example, the Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (internal quotation marks and citations omitted). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834.

To establish an Eighth Amendment claim for failure to protect an inmate, "the prisoner must demonstrate that the prison officials 'acted with deliberate indifference with respect to his safety or with an intent to cause harm to him.'" *Celestin v. Premo*, No. 9:12-CV-301, 2014 WL 272443, at *5 (N.D.N.Y. Jan. 24, 2014) (quoting *Hendricks v. Coughlin*, 942 F.2d 109, 113 (2d Cir.1991)). The existence, or potential existence, of substantial

8

risk of serious harm is the key element of a failure to protect claim, not the actual harm which may or may not transpire.  *Id.* (citing *Farmer*, 511 U.S. at 836).  A prison official is deliberately indifferent when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.

Moreover, to establish liability on the part of a defendant to an Eighth Amendment failure to protect or intervene claim, an inmate must show that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene."  *Vincent v. Sitnewski*, 117 F. Supp. 3d 329, 336 (S.D.N.Y. 2015) (citation omitted, alteration in original).  "[M]ere inattention or inadvertence does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene."  *Nix v. Lester*, No. 9:16-cv-828, 2017 WL 3610576, at *5 (N.D.N.Y. Aug. 4, 2017), *report and recommendation adopted sub nom. Nix v. Doe*, No. 9:16-cv-828, 2017 WL 3601239 (N.D.N.Y. Aug. 21, 2017) (citation omitted).

### A.    Proulx

Ryan's Eighth Amendment claim against Proulx relates solely to Proulx's conduct before the June 11, 2019 incident, and is predicated on Ryan's allegations and testimony that Proulx was deliberately indifferent to Ryan's security needs because he ignored warnings from Ryan and Erbe about threats posed by members of the Bloods gang, which created an "extremely high probability that [Ryan] would be attacked, as he was, and suffer severe injurie[s]." (Compl., ¶ 50.)  Defendants argue that Ryan's Eighth Amendment claim against Proulx should be dismissed for lack of personal involvement because Proulx was not present in the North Yard on June 11, 2019, Proulx had no involvement in the administration of safety and security measures at Clinton, and Proulx and Ryan had no interaction on June 11.  (Dkt. No. 37, Attach. 1 at 2-5.)  Defendants further argue that Ryan has not alleged sufficient facts to support a claim for deliberate indifference and that Ryan cannot show that Proulx's conduct "has risen 'to the level of disregarding a substantial and pervasive risk of violence.'" (*Id.* at 10 ( quoting *Warren v. Goord*, 476 F. Supp. 2d 407, 411 (S.D.N.Y. 2007).)  Ryan contends that Proulx—with knowledge that it was difficult for inmates to come forward with concerns of potential violence from other

inmates, knowledge of racial tension at Clinton, and with a realistic opportunity to intervene and prevent harm—ignored Ryan's explicit request to be placed in voluntary protective custody, an action tantamount to deliberate indifference to his safety.  (Dkt. No. 40 at 9-11.)

There are numerous disputes of fact that bear on Proulx's objective and subjective perception of a potential serious risk of harm to Ryan, including (1) whether it was Ryan or Proulx who initiated the June 7, 2019 meeting, (Pl.'s Response to Defs.' SMF ¶ 14), (2) if Proulx asked Ryan whether he would like to speak with security regarding his safety concern, (*id.* ¶ 15), (3) whether or not Ryan denied being in danger, (*id.* ¶ 16), and, critically, (4) if Ryan requested to be put in protective custody—Proulx's version of events is that protective custody was never requested, however, Ryan testified that he explicitly requested to be put in voluntary protective custody and his pleas were outright ignored, (*id.* ¶¶ 17, 19, 21).  Due to these disputed material facts, summary judgment on Ryan's Eighth Amendment claim against Proulx must be denied.  *See Rigano v. County of Sullivan*, 486 F. Supp. 2d 244, 255 (S.D.N.Y. 2007) (collecting cases) ("By now, it is well-established that to defeat a motion for summary judgment on an Eighth Amendment claim, there must be genuine issues as

11

to whether the corrections officers were aware that the plaintiff faced a substantial risk of serious danger.*").

## B.   **King and Bombardier**

Defendants argue that Ryan's Eighth Amendment claim must be dismissed against King and Bombardier because "they took objectively reasonable measures to attempt to quell the fighting and protect [Ryan,]" acted in accord with DOCCS policy to first rely on chemical agents to control a riot or brawl, and because they lacked a reasonable opportunity to intervene.[10]  (Dkt. No. 37, Attach. 1 at 6-10.)  Ryan argues that Bombardier and King had a reasonable opportunity to intervene, acted unreasonably in ordering officers to retreat and wait for the chemical agents to quell the brawl before intervening further, and that defendants have not produced a DOCCS policy that instructs officers to stand back while chemical agents are used to subdue a riot or brawl.  (Dkt. No. 40 at 11-14.)

---

[10]   Defendants rely on a case, wherein summary judgment was granted, brought by another inmate injured during the incident at issue here in support of their motion: *Reynolds v. Stone*, No. 920-CV-686, 2022 WL 3088425, at *14 (N.D.N.Y. June 21, 2022), *report and recommendation adopted sub nom. Reynolds v. Stone*, No. 9:20-CV-686, 2022 WL 3082465 (N.D.N.Y. Aug. 3, 2022).  (Dkt. No. 37, Attach. 1 at 10.)  Although the relevant legal standards are applicable and some factual analysis is analogous to the issues here, the *Reynolds* decision is not, as defendants suggest, binding on this court.  (Dkt. No. 43 at 2.)

Defendants have submitted the declarations of Bombardier and King, which both state that the orders they gave were in accordance with DOCCS policy.  (Dkt. No. 37, Attachs. 5, 6.)  Specifically, Bombardier states: "[i]t is DOCCS policy to use tear gas to quell a disturbance like the relevant incident before officers can safely intervene on the ground."  (Dkt. No. 37, Attach. 5 ¶ 26.)  And King's declaration states: "[i]t is DOCCS policy to use chemical agents to quell disturbances such as the one on June 11, 2019, for the safety of the staff as well as the safety of the incarcerated individuals."  (Dkt. No. 37, Attach. 6 ¶ 11.)  Ryan argues, without a single citation, that defendants' claim that they were following DOCCS policy "can be rejected on several grounds," including because defendants have not produced such policy in writing, "the superintendent"[11] did not make reference to a policy in his deposition or declaration, "the deputy of security knew of no such policy," and " the fact that none of the official reports reflect any order by [Bombardier] or King to retreat . . . strongly suggests that they hid this from their superiors, an unlikely course

_____

[11] Ryan makes no attempt to identify the "superintendent" or the "deputy of security" that he references in his response.  (Dkt. No. 40 at 12.)  The court, upon review of the record, deduces that Ryan refers to Bell and Zerniak—defendants dismissed from this action because Ryan admits that they were not personally involved in the incident at issue.  (*Id.* at 1.)

if implementing any such strategy was part of a practice or accepted protocol."[12]  (Dkt. No. 40 at 12.)

Defendants do not claim that the policy they followed was a formal, written policy.  And the deposition and declaration testimony of King and Bombardier is competent and admissible evidence that DOCCS policy was followed.  (*See supra* Part. II.A. note 6.)  Ryan has pointed to no policy or directive from DOCCS, or elsewhere, that requires or directs officers to act differently than described by King and Bombardier.  (*Id.*)  Moreover, the Investigative Report issued by DOCCS Office of Special Investigations explicitly found that, "[t]he review of the use of gas by security staff determined the officers acted within the scope of their employment and their actions **were within department guidelines and directives**."  (Dkt. No. 39, Attach. 13 at 2 (emphasis added).[13])  The record being devoid of any evidence to the contrary—and defendants having submitted affirmative

---

[12]  Not only does Ryan entirely fail to cite to evidence that supports his argument that King and Bombardier "hid" their actions from their superiors, the reports and memoranda filed after the incident explicitly mention the use of chemical agents for the purpose of quelling the riot before officers could safely intervene.  (*See, e.g.*, Dkt. No. 39, Attach. 7 (memorandum to Lieutenant Guynup from King describing, in detail, the use of chemical agents during the riot and Bombardier's activation of a "Level 2" to request backup ); Dkt. No. 39, Attachs. 11, 12 (incident reports describing, in detail, the use of chemical agents for the purpose of obtaining compliance from the inmates during the riot).)

[13]  The citation refers to the pagination generated by CM/ECF, the court's electronic filing system.

proof and Ryan failing to refute it—the evidence indicates that King's and Bombardier's orders were in accordance with DOCCS policy.

Additionally, to establish King's or Bombardier's liability, Ryan must show that they "had a realistic opportunity to intervene and prevent the harm." *Vincent*, 117 F. Supp. 3d at 336; *see Nix*, 2017 WL 3610576, at \*5. Defendants have submitted two video recordings of the June 11, 2019 brawl (hereinafter "the videos"). (Dkt. No. 37, Attach. 3, Ex. D.) A review of the videos shows the following approximate timeline: (1) after the first round of tear-gas canisters were deployed, the gas cleared around the 1:52 time marker, (2) fighting between some inmates resumed around the 2:13 time marker, (3) another tear-gas canister was then deployed, which cleared around the 2:43 time marker and fighting immediately resumed, (4) additional tear-gas canisters were deployed, which cleared around the 4:03 time marker, at which point, the fighting had entirely ceased, and (5) corrections officers are observed in the North Yard beginning to escort inmates around the 5:47 time marker. (*Id.*) Thus, at most, corrections officers responding on the ground had a window of approximately twenty-one seconds—between when the first round of tear-gas cleared at the 1:52 time marker and when the fighting resumed at the 2:13 time

15

marker—during which they reasonably could have intervened.  The approximately twenty-one second time-period, when the inmates were not actively fighting and tear gas was not actively engulfing the North Yard, was not a reasonable opportunity for Bombardier or King to intervene.  *See Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (quoting *Parker v. Fogg*, 85-CV- 0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb. 17, 1994) (holding that officers "cannot be held liable for failure to intervene in incidents that happen in a 'matter of seconds'").

Moreover, it is undisputed that when the riot began, there were nearly 350 inmates in the North Yard and staff were outnumbered by a ratio of approximately 20:1.  (Defs.' SMF ¶¶ 25, 32.)  There was no reasonable opportunity for the officers present at the beginning of the riot to intervene because of how vastly outnumbered they were and it was reasonable for Bombardier and King to order those officers to wait until additional responding officers arrived and the riot was suppressed by tear gas before re-entering the North Yard to escort inmates away.  (Dkt. No. 37, Attach. 6 ¶ 12 ("[D]ue to the number of incarcerated individuals involved, officers on the ground did not have a realistic opportunity to intervene until after the tower officers were able to quell the disturbance.")); *see Anderson v.*

16

*Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.") (citation omitted).

The Constitution requires prison officials and officers to take reasonable measures to protect the safety of inmates and, more specifically, the Eighth Amendment imposes a duty that they protect inmates from suffering violence at the hands of other inmates.  *See Hayes,* 84 F.3d at 620; *Farmer*, 511 U.S. at 832-33.  However, corrections officers are not the personal body guards of inmates and their sergeants are not Leonidas I leading a vastly outnumbered army to certain death at the Battle of Thermopylae.  Therefore, as King and Bombardier took reasonable measures to ensure the safety of Ryan and all others on the North Yard, and had no reasonable opportunity to intervene until after the riot had been quelled by chemical agents, defendants' motion is granted as to King and Bombardier.

**C.**   **Qualified Immunity**

Defendants also argue that they are entitled to summary judgment on qualified immunity grounds because they did not violate Ryan's statutory or constitutional rights and because the alleged constitutional violations (i.e.

17

the use of tear gas and waiting to intervene until the riot was quelled) were not clearly established.[14]  (Dkt. No. 37, Attach. 1 at 14-17.)  Ryan contends that the order to remove officers while the tear gas stymied the riot "violates the basic responsibility of the corrections staff," and that because defendants have not produced a policy that supports their actions on June 11, 2019, the order to remove officers from the North Yard "violates the right to be protected, particularly where other means chosen to discharge this duty were observed to be ineffectual."  (Dkt. No. 40 at 14-16.)

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  In other words, "[an] officer is entitled to

---

[14]  Defendants' qualified immunity argument cannot fairly be read to include Proulx's conduct as their argument refers exclusively to the staff's conduct on June 11, 2019.  (Dkt. No. 37, Attach. 1 at 14-17.)  Regardless, qualified immunity is not available to Proulx at this juncture in light of the material factual disputes underlying the claim against him.  *See Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) (noting that a qualified immunity defense at the summary judgment stage requires that no dispute about material factual issues that inform that defense remain); *see also Parker v. Donnelly*, No. 9:21-CV-130, 2022 WL 7290103, at *12 (N.D.N.Y. July 15, 2022).  Therefore, the court considers qualified immunity only to the extent it may pertain to King and Bombardier.

qualified immunity if (1) his conduct does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did not violate a clearly established right." *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008), *abrogated on other grounds*, (citing *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995)); *see also Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010).

A right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

As set forth herein, King and Bombardier did not violate Ryan's statutory or constitutional rights. The specific violations Ryan complains of—corrections officers relying on chemical agents to quell a brawl before personally engaging when vastly outnumbered and the issuance of an order that officers on the ground hold back until the fighting is subdued—are not "clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12

(2015) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established . . . .   This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.") (internal quotation marks and citations omitted).  And it was objectively reasonable for King and Bombardier to believe it was not a violation of Ryan's constitutional rights to use tear gas to stop a riot before engaging physically with inmates, in accordance with DOCCS policy, when corrections officers were outnumbered 20:1.  *See Conley v. Brysgel*, No. 3:17-CV-322, 2020 WL 3619921, at *11-12 (D. Conn. July 2, 2020) (finding corrections officer entitled to qualified immunity because he held an objectively reasonable belief his actions were lawful, particularly in light of that fact that "there is no clearly established law that [the defendant] needed to take any more action [to intercede] than he did").

For these reasons, even if King and Bombardier were not entitled to summary judgment on the substance of Ryan's claim, as detailed above, they would be entitled to summary judgment based upon the doctrine of qualified immunity.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 37) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** as to Ryan's Eighth Amendment claim as against Bell, Zerniak, King, and Bombardier; and
>
> **DENIED** in all other respects; and it is further

**ORDERED** that Ryan's Eighth Amendment claim against Proulx survives; and it is further

**ORDERED** that this case is deemed trial ready and a trial scheduling order will be issued in due course; and it is further

**ORDERED** that the Clerk shall terminate Bell, Zerniak, King, and Bombardier from this case; and it is further

**ORDERED** that the Clerk amend the docket to reflect the proper spelling of the following defendants' names: (1) "Daniel J. Bombadier" changed to "Daniel J. Bombardier" and (2) "Proloux" changed to "Jonathan Proulx"; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

January 3, 2024
Albany, New York

Gary L. Sharpe
U.S. District Judge